COMMONWEALTH *vs.* ERIC ROMERO.

No. 09-P-1926.

Middlesex. October 20, 2010. - November 14, 2011.

Present: RAPOZA, C.J., CYPHER, TRAINOR, MEADE, & SIKORA, JJ.[1]

Further appellate review granted, 461 Mass. 1105 (2012).

*Firearms. Practice, Criminal,* Required finding, Confrontation of witnesses, Harmless error. *Evidence,* Constructive possession, Ballistician's certificate, Admissions and confessions. *Constitutional Law,* Confrontation of witnesses, Harmless error. *Error, Harmless.*

At the trial of a criminal complaint charging carrying a firearm without a license, there was sufficient evidence to sustain the defendant's conviction on a theory of constructive possession, where the jury could reasonably have found that the defendant had knowledge of the firearm, which was in the defendant's automobile in the lap of a passenger in the front seat while the defendant sat in the driver's seat a little more than one foot away, and that the defendant had the requisite ability and intent to exercise dominion and control over the firearm, given other incriminating "plus factors," i.e., the defendant was the owner and operator of the automobile where the gun was found; the firearm was in close proximity to and in plain view of the defendant; and the defendant, as well as his passengers, were behaving in a surreptitious manner while parked on a dark street at 1:30 A.M. [794-799] TRAINOR, J., dissenting, with whom SIKORA, J., joined.

Discussion of the standard of review of claims challenging the sufficiency of evidence. [799-801]

A criminal defendant's claim that the evidence developed at trial tended equally to sustain either of two inconsistent propositions lacked merit. [801]

At a criminal trial, the erroneous admission in evidence of a certificate of ballistics analysis, without accompanying testimony by the analyst who prepared it, was harmless beyond a reasonable doubt, where the return of spent casings along with the firearm from the State police laboratory permitted the jury to reasonably infer beyond a reasonable doubt that the weapon was a working firearm. [801-803]

There was no merit to a criminal defendant's claim that his statements made to a police officer constituted hearsay. [803]

---

[1]This case was initially heard by a panel comprised of Justices Trainor, Meade, and Sikora. After circulation of the opinion to the other justices of the Appeals Court, the panel was expanded to include Chief Justice Rapoza and Justice Cypher. See *Sciaba Constr. Corp.* v. *Boston,* 35 Mass. App. Ct. 181, 181 n.2 (1993).

COMPLAINT received and sworn to in the Waltham Division of the District Court Department on April 23, 2008.

The case was tried before *Dyanne J. Klein, J.*

*Devon Dietz Hincapie* for the defendant.

*Ceara C. Mahoney,* Assistant District Attorney, for the Commonwealth.

MEADE, J. After a jury trial, the defendant was convicted of carrying a firearm without a license, in violation of G. L. c. 269, § 10(*a*). On appeal, he claims that (1) there was insufficient evidence to support his conviction, (2) the admission of a ballistics certificate in evidence violated his confrontation rights, and (3) his statements to the police were improperly admitted in evidence. We affirm.

1. *Background.* a. *The Commonwealth's case.* On April 23, 2008, at approximately 1:30 A.M., Sergeant Dennis M. Deveney, Jr., of the Waltham police department was on patrol in the area of Moody Street. Deveney's attention was drawn to a small, black BMW two-door sports coupe parked on Chestnut Street, which intersects with Moody Street. The car held four individuals. When Deveney drove past the car, he could only see the tops of their heads, and they were all slouched down low in their seats. Although Moody Street was well lit during the early morning, Chestnut Street was much darker.

Deveney also saw that the car's interior dome light was on, but as he drove past the car in his marked police cruiser, the light was extinguished. Within a couple of minutes, Deveney turned around and drove back to Chestnut Street and parked thirty feet behind the car to further observe the car and its occupants. Without activating his blue lights, Deveney got out of his cruiser and walked toward the car. He approached the car on the passenger's side. When he reached the vehicle, he stood about three to five feet away and looked inside at the occupants. The front passenger's-side window was cracked open about two inches and Deveney could hear music playing. From his observation point, Deveney could see the rear driver's-side passenger reach toward the front of the car through the middle of the two front seats. While this occurred, Deveney saw the defendant, who was the owner and operator of the car, looking from side to side and watching the front seat passenger, Eduardo Alvarez,

examining an object in his hand. The defendant was seated between twelve and eighteen inches away from Alvarez.

At this point, Deveney shined his flashlight into the vehicle's interior and said something to the effect of, "Hey, what's going on guys?" Alvarez turned toward Deveney with a panicked look on his face and dropped the object he was holding into his lap. When Deveney trained the light on the object, he could see it was a black handgun. Deveney opened the car door, drew his service weapon, pointed it at Alvarez, and called for backup. When backup arrived, the occupants were removed from the car.

Deveney removed the defendant to an area about thirty feet away from the car. The defendant claimed that he had no knowledge that there was a firearm in his car, nor did he know that it was being passed around. The defendant did admit that he knew that, in general, Alvarez had a gun, but he did not know that Alvarez had it in the car that night. The defendant also admitted that he had been at Alvarez's Chestnut Street home earlier that afternoon around 4:00 P.M. He told Deveney that Alvarez had handed him a gun outside the home, which the defendant held for ten to fifteen seconds before he returned it to Alvarez. The defendant was then arrested.

Officer Kevin Sullivan took custody of the gun at the scene and determined that it was unloaded. Deveney returned with an evidence bag, and Sullivan placed the gun in the bag. Deveney took control of the weapon at that time. At the police station later that morning, Sullivan had an opportunity to look at the gun again. He saw that the gun's serial number had been filed off and covered in black paint. After Sullivan saw this, Deveney secured the gun with a cable lock, put the gun back into the evidence bag, placed the bag in a gun box, and placed it into evidence storage at the Waltham police department. The gun was later sent to the State police crime laboratory to determine whether it was capable of discharging a live round of ammunition. When the gun was returned to the Waltham police department in the same evidence bag, it was accompanied by a small manila envelope containing a discharged round of ammunition. Also accompanying the gun was the State police ballistician's certificate, which indicated that the firearm had been test fired and that it was an operating firearm.

b. *The defense.* The defendant testified that he had left work

around 4:30 P.M. on April 23, 2008, to take his girlfriend out to dinner. While waiting in his vehicle at the curb of his girlfriend's house, the defendant was approached by his girlfriend's brother, Eduardo Alvarez. Alvarez walked around to the driver's side window and showed the defendant a firearm. The defendant looked at the firearm, touched it, and returned it to Alvarez. The defendant then left with his girlfriend on their dinner date in Boston.

Around midnight, the defendant drove his girlfriend back to her home. When they arrived back at her house, her two brothers, including Alvarez, were waiting outside. Alvarez asked the defendant to take the two brothers for a ride in his new car, and the defendant agreed. A short time later, the defendant drove back to the house and pulled up to the curb where he had earlier parked. According to the defendant, the police arrived just as his girlfriend's brothers were preparing to exit the vehicle.

The defendant had seen the police drive by him on Moody Street, but he was unconcerned as he was not doing anything wrong. Within a few minutes, the defendant testified, Deveney was asking them what they were doing. He denied knowing the gun was in the car, and did not see it in the car. The defendant acknowledged that he told Deveney that he had seen the gun earlier that day.

2. *Discussion.* a. *Sufficiency of the evidence.* "When analyzing whether the record evidence is sufficient to support a conviction, an appellate court is not required to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt' (emphasis in original). *Commonwealth* v. *Velasquez,* 48 Mass. App. Ct. 147, 152 (1999), quoting from *Jackson* v. *Virginia,* 443 U.S. 307, 318-319 (1979). See *Commonwealth* v. *Hartnett,* 72 Mass. App. Ct. 467, 475 (2008). Rather, the relevant 'question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt' (emphasis in original). *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), quoting from *Jackson* v. *Virginia, supra.*" *Commonwealth* v. *Pixley,* 77 Mass. App. Ct. 624, 630 (2010).

Here, the Commonwealth's case against the defendant was presented on the theory of constructive possession. To prove

constructive possession of a firearm, the Commonwealth must establish the defendant's "knowledge coupled with the ability and intention to exercise dominion and control." *Commonwealth* v. *Sespedes*, 442 Mass. 95, 99 (2004), quoting from *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 409 (1989). A defendant's "knowledge or intent is a matter of fact, which is often not susceptible of proof by direct evidence, so resort is frequently made to proof by inference from all the facts and circumstances developed at the trial." *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). In constructive possession cases, a defendant's presence alone is not enough to show knowledge, or the ability and intention to exercise control over the firearm, but "presence, supplemented by other incriminating evidence, 'will serve to tip the scale in favor of sufficiency.' " *Commonwealth* v. *Albano*, 373 Mass. 132, 134 (1977), quoting from *United States* v. *Birmley*, 529 F.2d 103, 108 (6th Cir. 1976).

The defendant first claims that there was insufficient evidence to support the inference that he had knowledge of the firearm. We disagree. In the light most favorable to the Commonwealth, Sergeant Deveney observed the firearm in the defendant's car, on the lap of his front seat passenger, while the defendant was sitting in the driver's seat a little more than a foot away. This was sufficient to establish the defendant's knowledge of the weapon. See *Commonwealth* v. *Albano, supra* at 135 ("Knowledge may be inferred when the prohibited item is found in open view in an area over which the defendant has control"). In addition, from Sergeant Deveney's testimony, a rational jury could infer that the gun was being passed around the interior of the vehicle. "Although not overwhelming, taken in the light most favorable to the Commonwealth, this evidence provided a sufficient basis for a juror to infer that the defendant knew about and had the ability to exercise dominion and control over [the firearm] . . . ." *Commonwealth* v. *Frongillo*, 66 Mass. App. Ct. 677, 681-682 (2006).

The defendant next claims that there was insufficient evidence to establish that he had the ability and intent to exercise dominion and control over the firearm. Again, we disagree. In addition to the defendant's presence in the car and his knowledge of the gun, there was other incriminating evidence, i.e., "plus factors,"

to warrant the inference that the defendant intended to exercise control over the firearm. See *Commonwealth* v. *Brown*, 34 Mass. App. Ct. 222, 226 (1993). Primary among the other incriminating evidence were two important plus factors: the defendant was the owner and operator of the car in which the firearm was found. See *Commonwealth* v. *Bienvenu*, 63 Mass. App. Ct. 632, 638 (2005) (ownership of vehicle is inculpatory factor); *Commonwealth* v. *Aiello*, 49 Mass. App. Ct. 496, 498 (2000) ("knowledge of the presence of drugs or of weapons more readily warrants an inference of control against a driver than a passenger") (footnote omitted); *Commonwealth* v. *Sanchez*, 40 Mass. App. Ct. 411, 416 (1996) (defendant driver's control of vehicle was of equal significance to ownership); *Commonwealth* v. *Gray*, 5 Mass. App. Ct. 296, 298 (1977) (where defendant driver knew of presence of weapons, "[t]hese factors, taken together, were sufficient to permit the jury to infer that the weapons were under the defendant's control in a vehicle"). Cf. *Commonwealth* v. *Handy*, 30 Mass. App. Ct. 776, 781 n.5 (1991) (ownership of and presence on premises are relevant inculpatory factors).

An owner and operator of a motor vehicle, who has knowledge of the presence of a firearm, unquestionably has the ability to exercise dominion and control over that firearm. If the owner and operator of the car chooses not to exclude a passenger who he knows has a weapon, it is a reasonable inference that the owner and operator also has the intent to exercise dominion and control over the firearm as he does over the car itself. While this is not a required inference from these circumstances, such certitude is not a necessary part of our review. See *Commonwealth* v. *Casale*, *supra* at 173 ("inferences drawn by the jury need only be reasonable and possible and need not be necessary or inescapable").

A third plus factor was the proximity of the firearm to, and in plain view of, the defendant. When viewed in the light most favorable to the Commonwealth, it is a fair inference that the firearm was being passed among the occupants of the car as Sergeant Deveney stood nearby. Deveney could see inside the car, where Alvarez sat in the front passenger seat. When Deveney shined his flashlight inside the vehicle, Alvarez looked

"panicked" and dropped the gun on his lap. In the small, two-door automobile, the defendant sat a mere twelve to eighteen inches away from Alvarez.[2] See *Commonwealth* v. *Aiello, supra* (possession "may often be inferred from proximity conjoined with knowledge"); *Commonwealth* v. *Sadberry,* 44 Mass. App. Ct. 934, 936 (1998) (gun's location near defendant in car was proper consideration on question of dominion and control).

A fourth plus factor can be found in the defendant's behavior, that of his passengers, as well as the time and location of the incident. At 1:30 A.M., the defendant chose to park his car on the much darker Chestnut Street instead of the well-lit Moody Street with which it intersected.[3] All four occupants were "slouched" down in their seats, leaving only their heads and the very tops of their torsos visible from the outside. The interior light was on, but it was extinguished when Deveney passed by in his police cruiser. While Deveney observed the firearm being passed from the back to the front of the car, the defendant was looking from side to side and watching Alvarez as he examined the firearm in his hand.[4]

---

[2] The dissent considers it significant that Sergeant Deveney did not observe the defendant touching the firearm. See *post* at 805. Suffice it to say the Commonwealth's theory of prosecution was that of constructive, not actual, possession.

[3] The dissent's assertion that the defendant merely chose to park where he did because that was where his girlfriend resided is evidence derived from the defendant's testimony, which the jury were not required to accept. See *post* at 810. Similarly, the dissent's proffered inference that Alvarez brought the firearm from his Chestnut Street house and would have returned there with it is also drawn from the defendant's testimony, which the jury were free to reject. See *post* at 805-806. In both these instances, and as a recurring theme, the dissent improperly seeks to draw inferences from the defendant's evidence rather than viewing the evidence in the light most favorable to the Commonwealth.

[4] Contrary to the dissent's view, the fact that the firearm was not loaded does not negate the reasonable inference of the defendant's intent to exercise dominion and control over the firearm. See *post* at 806, 807. Rather, had the firearm been loaded, the defendant would have been charged with an additional offense and punished differently if convicted thereof. See G. L. c. 269, § 10(*n*) (possession of loaded firearm shall be further punished by imprisonment from and after sentence for violation of G. L. c. 269, § 10(*a*), not to exceed two and one-half years). Also contrary to the dissent's suggestion, establishing the defendant's purpose for his constructive possession of an illegal firearm is not a burden the Commonwealth bears. See *post* at 807-808.

From the evidence that all four occupants were slouched down in their seats, the jury could conclude that this behavior was not simply indicative of collective bad posture. Rather, when viewed favorably towards the Commonwealth, it suggests that all four, and not just those who touched the gun, were engaged in a surreptitious criminal activity that they endeavored to conceal from view. This inference is buttressed by the fact that the car was parked on a dark street at 1:30 A.M., but even more so by the fact that the interior light went off upon the arrival of a police officer. Finally, the defendant's searching or furtive head movements could reasonably be understood to have been made in an effort to avoid detection of the ongoing criminal activity within the car.[5] See *Commonwealth* v. *Albano*, 373 Mass. at 133-135 (proper considerations on question of dominion and control are time of day, place, and defendant's behavior and knowledge); *Commonwealth* v. *Bailey*, 29 Mass. App. Ct. 1007, 1008 (1990) (same).

From the combination of the defendant's presence, his knowledge, and the above plus factors, a rational jury, employing common sense, see *Commonwealth* v. *Drew*, 4 Mass. App. Ct. 30, 32 (1976) ("Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense"), could reasonably find that the defendant had the requisite ability and intent to exercise dominion and control over the firearm. See *Commonwealth* v. *Maillet*, 54 Mass. App. Ct. 910, 911 (2002) ("plus factors" of varying potency may collectively establish a reasonable inference of intent). As has been stated in the context of a joint venture, "[t]he line that separates mere knowledge of unlawful conduct and participation in it, is 'often vague and

---

[5]We do not, as the dissent claims, conflate the defendant's knowledge of the firearm with his intent to exercise dominion and control over it. See *post* at 808, 809. Rather, as illustrated above, the entirety of the Commonwealth's evidence, and the enumerated plus factors, demonstrate that a rational jury was entitled to conclude that the defendant possessed the necessary intent. Also, that the dissent chooses to conclude that the defendant's slouching behavior is more reasonably indicative of his knowledge and not his intent is simply a choice between reasonable inferences. However, *Jackson* and *Latimore* do not empower this court to make that choice. See *Jackson* v. *Virginia*, *supra* at 326 (reviewing court must defer to conflicting inferences in favor of the prosecution).

uncertain. It is within the province of the jury to determine from the evidence whether a particular defendant [has] crossed that line.' " *Commonwealth* v. *Longo*, 402 Mass. 482, 487 (1988), quoting from *Commonwealth* v. *Cerveny*, 387 Mass. 280, 287 (1982).

Finally, relative to the sufficiency of the evidence, the defendant requests that we employ the well-worn axiom that "[w]hen the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof." *Commonwealth* v. *Croft*, 345 Mass. 143, 145 (1962), quoting from *Commonwealth* v. *O'Brien*, 305 Mass. 393, 400 (1940). Specifically, the defendant claims that the facts developed at trial could equally be reconciled with his lack of knowledge, and further that his statements to the police and his conduct were entirely consistent with innocence. Be that as it may, there is considerable doubt that there remains any vitality in the "equal and inconsistent" concept. The concept was born here in the Commonwealth in the Nineteenth Century in a tort action. See *Smith* v. *First Natl. Bank*, 99 Mass. 605, 612 (1868) ("When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof"). By 1933, the concept was adopted at the Federal level, see *Pennsylvania R.R. Co.* v. *Chamberlain*, 288 U.S. 333, 339-340 (1933) (citing *Smith* v. *First Natl. Bank* with approval), but that adoption was short lived as it was abandoned in *Lavender* v. *Kurn*, 327 U.S. 645, 652-653 (1946). See *Planters Mfg. Co.* v. *Protection Mut. Ins. Co.*, 380 F.2d 869, 873-874 (5th Cir. 1967) (recognizing the abandonment of *Chamberlain* in *Lavender*), cert. denied, 389 U.S. 930 (1967); *Daniels* v. *Twin Oaks Nursing Home*, 692 F.2d 1321, 1325 (11th Cir. 1982) (same). See also *Gallick* v. *Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 114-115 (1963) ("It is not the function of a court to search the record for conflicting circumstantial evidence in order to take the case away from the jury on a theory that the proof gives equal support to inconsistent and uncertain inferences"); *Wratchford* v. *S.J. Groves & Sons Co.*, 405 F.2d 1061, 1066 (4th Cir. 1969) ("The old notion that a jury should not be allowed to draw any inference from circumstantial evidence, if the one is as probable as the other,

has fallen into discard and has been replaced by the more sensible rule that it is the province of the jury to resolve conflicting inferences from circumstantial evidence"); 9B Wright & Miller, Federal Practice and Procedure § 2528 (3d ed. 2008) (equally probable inference concept is no longer the rule in Federal courts because it is impossible to determine whether two or more reasonable inferences are equal without weighing the evidence, which is exclusively the province of a jury).

Perhaps most importantly, the concept appears to be at odds with much of what the Supreme Court decided in *Jackson* v. *Virginia*, 443 U.S. at 318-319, which is our *Latimore* standard. In *Jackson* v. *Virginia*, the Court held that a reviewing court is simply not permitted "to make its own subjective determination of guilt or innocence." *Id.* at 319 n.13. In other words, our appellate office does not permit us to reweigh the evidence ourselves to determine whether the jury made the correct guilt or innocence determination, but rather, after viewing the evidence in the light most favorable to the prosecution, we may only determine whether the jury made a rational decision regarding the defendant's guilt. See *Herrera* v. *Collins*, 506 U.S. 390, 402 (1993); *Stewart* v. *Coalter*, 48 F.3d 610, 616 (1st Cir. 1995), cert. denied, 516 U.S. 853 (1995). Indeed, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume — even if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.' " *McDaniel* v. *Brown*, 130 S. Ct. 665, 673 (2010), quoting from *Jackson* v. *Virginia*, *supra* at 326. See *Commonwealth* v. *Wilborne*, 382 Mass. 241, 245 (1981), quoting from *Commonwealth* v. *Amazeen*, 375 Mass. 73, 81 (1978) ("To the extent that conflicting inferences are possible from the evidence, 'it is for the jury to determine where the truth lies' ").

Moreover, *Jackson* holds that for evidence to be sufficient, the prosecution does not have "an affirmative duty to rule out every hypothesis except that of guilt . . . ." *Jackson* v. *Virginia*, *supra*. Or, as the Supreme Judicial Court has formulated, the "Commonwealth need not 'exclude every reasonable hypothesis of innocence to prove its case, if the record viewed in its entirety supports a conclusion of guilt beyond a reasonable doubt.' "

*Commonwealth* v. *Platt*, 440 Mass. 396, 401 (2003), quoting from *Commonwealth* v. *Merola*, 405 Mass. 529, 533-534 (1989). The qualitative nature of the *Jackson* inquiry renders dispensable hypotheses of innocence; it is not a quantitative inquiry. In order for the evidence to be sufficient, the Commonwealth does not bear a burden of disproving plausible scenarios of innocence even if they are numerically equal to those which support guilt. This is because a reviewing court is not free to reweigh the evidence and set aside a jury verdict merely because the jury could have drawn different inferences or conclusions or because the court believes that another result is more reasonable. Rather, since the jury found the defendant guilty, we must defer to its resolution of the conflicting inferences in favor of the prosecution. *Jackson* v. *Virginia, supra.* See *Stewart* v. *Coalter, supra* ("A rational jury might well have acquitted without violating its oath; but drawing all reasonable inferences in favor of the prosecution, a rational jury could also convict").

Finally, be it legal maxim or anachronistic canard, the "equal and inconsistent" concept does not apply to the circumstances of this case. The concept applies, if at all, "to situations in which any view of the Commonwealth's evidence, however favorable, still requires a leap of conjecture with respect to essential elements of the crime charged in order to obtain a conviction." *Commonwealth* v. *Latney,* 44 Mass. App. Ct. 423, 426 (1998). The defendant's claim here simply asks that we view the evidence and weigh the inferences in his favor, but this we cannot do. At bottom, the jury's conclusion of guilt did not require a leap of conjecture with respect to the defendant's knowledge and intent, and that evidence was simply not in equipoise with the defendant's theory of innocence. See *Commonwealth* v. *Hernandez,* 77 Mass. App. Ct. 259, 265 (2010).

b. *The ballistics certificate.* At trial, the Commonwealth offered, over the defendant's objection, the ballistics certificate that was prepared by the State police laboratory at the request of the Waltham police. The Commonwealth now concedes that, in light of *Melendez-Diaz* v. *Massachusetts,* 129 S. Ct. 2527 (2009), and its progeny, the admission of the certificate without accompanying testimony from the certifying analyst was error. The Commonwealth further asserts, however, that the error was harmless.

Because the defendant objected to the admission of the certificate, we analyze the admission of the certificate to determine whether the error was harmless beyond a reasonable doubt.[6] See *Commonwealth* v. *Vasquez*, 456 Mass. 350, 355-360 (2010). In other words, we must "be satisfied, beyond a reasonable doubt, that the erroneously admitted certificate[] of analysis had little or no effect on the verdict[]." *Id.* at 362.

Our analysis on this point is controlled by *Commonwealth* v. *Depina*, 456 Mass. 238, 247-253 (2010). In *Depina*, the firearm at issue was offered through the testimony of a New Bedford police sergeant and a New Bedford police officer. The State police trooper who had conducted the firearm's testing did not testify. At trial, the police officer testified to the recovery of the weapon and the placement of the weapon into a gun box and then into a locked cabinet at the police station. *Id.* at 249-250. She also testified to turning the weapon over to the police sergeant who was the commander of the firearms division. *Id.* at 250. The sergeant testified that when he inspected the weapon, it was loaded, and he explained the difference between live rounds and a spent round. *Ibid.* He then explained that the weapon and the ammunition were sent to the State police laboratory. *Ibid.* When the weapon was returned to him in New Bedford, along with the certificate, the gun box contained the weapon and spent casings and only one live round.

The Supreme Judicial Court held that the admission of the certificate in these circumstances was harmless beyond a reasonable doubt. The return of the spent casings along with the weapon permitted the jury to reasonably infer beyond a reasonable doubt that the State police had test fired the weapon. *Id.* at 250-251. These facts and the court's ruling in *Depina* are controlling here.

Officer Sullivan had control of the weapon at the scene until Sergeant Deveney took control of the weapon and placed it in an evidence bag. When Deveney returned to the station, Sullivan watched as Deveney put a cable lock on the weapon and placed it in a gun box. Deveney then marked the box and placed a copy of the report in the box; then he put the box in the evidence

---

[6]The trial in this matter was prior to the Supreme Court's opinion in *Melendez-Diaz, supra,* and thus the ruling was not error at the time of trial.

locker. The evidence officer then logged the gun box and sent it to the State police laboratory for testing.

Deveney further testified that the gun box was returned to the evidence locker from the State police laboratory. He brought the gun box to court and testified that the gun box contained the weapon he seized from the defendant's car. The weapon had been tagged by the State police ballistician after it had been test fired. The gun was in the original evidence bag, and with the gun were the cable lock and a small manila envelope that contained a discharged round of ammunition from the weapon along with the certificate at issue here. As in *Depina, supra,* here the jury could infer from this evidence that the weapon was a working firearm.

Our conclusion is further supported by the fact that after the certificate was introduced in evidence, neither party mentioned it again during the trial or in their closing arguments. Also, the judge did not give a standard instruction to the jury that the certificate was prima facie evidence that the gun was a firearm, but only that the jury could consider it with all the relevant evidence when determining if the Commonwealth had met its burden of proof. This resulted in the certificate carrying significantly less evidentiary weight than it would ordinarily.

c. *The defendant's statements.* Finally, the defendant claims that his statements made at the scene to Sergeant Deveney were inadmissible hearsay. We disagree. The defendant's statements constituted admissions, and were properly admitted on that basis. See *Commonwealth* v. *DiMonte,* 427 Mass. 233, 243 (1998); Mass. G. Evid. § 801(d)(2)(a) (2011).

*Judgment affirmed.*

TRAINOR, J. (dissenting, with whom Sikora, J., joins). Attempting to rationalize the imposition of criminal liability for crimes that include the element of "possession," but where there is no actual possession, we have constructed terminology and inferences purportedly designed to direct our factual inquiries to those factors that will determine whether the defendant had the requisite knowledge, ability, and intent to possess the item. We

have been applying the doctrine of constructive possession for many years but to very mixed reviews from prosecutors, defense attorneys, and legal scholars alike.[1] Forty years ago, a United States Court of Appeals judge faced with the difficulties of applying the legal fiction of constructive possession observed that:

> "[t]he rhetorical legerdemain compounded in this area of law invokes abstractions which appear more designed to achieve a particular result in an individual case than to stabilize and formalize a workable index of objective standards. The more cases one reads on constructive possession the deeper is he plunged into a thicket of subjectivity. Successive cases enumerate a continuing reinterpretation which can only be described as judicial whimsy. To basic questions to which the answer should be 'Always', judicial hair-splitting settles for a wavering 'Sometimes'. . . . Both prosecutor and defendant's attorney present their cases with the unfortunate knowledge that the law of constructive possession is what we will say it is in our next opinion. . . . Lawyers in future cases, concerned as to the issue of constructive possession, will still find most trial and appellate courts simultaneously looking in both directions."[2]

We are still faced with these very same difficulties in applying the doctrine, but I dissent not because of these difficulties. I respectfully dissent because I believe that the majority has not only misapplied the facts and reasonable inferences to the required elements of the crime, but it has added a significant new inference to our body of law, effectively making a defendant strictly liable for possessory offenses when knowledge is joined with a proprietary interest. Such an inference takes us even further from the historical and correct requirement of establishing the mens rea of intent to possess. The majority

---

[1]See generally Whitebread & Steven, Constructive Possession in Narcotic Cases: To Have and Have Not, 58 Va. L. Rev. 751 (1972); McMurray, Hands Off the Gun — A Critique of United States v. Jameson and Constructive Possession Law in the Tenth Circuit, 85 Denv. U. L. Rev. 531 (2008).

[2]United States v. Holland, 445 F.2d 701, 703-704 (D.C. Cir. 1971) (Tamm, J., concurring).

would render a defendant's actual intent almost irrelevant, while effectively binding the jury's verdict, under these circumstances.

Our case law has historically required three elements to prove constructive possession of a firearm. The Commonwealth must prove that the defendant had (1) knowledge of the presence of the firearm, (2) the ability to exercise control over the firearm, and (3) the *intention* to exercise control over the firearm. See, e.g., *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 409 (1989). Review of the evidence persuades me that, although the evidence was sufficient to permit a reasonable inference that the defendant had knowledge of the firearm and an ability to control it, there was insufficient evidence on the element of his intent to do so.

Here, Sergeant Deveney observed the firearm in the defendant's automobile, on the lap of his front seat passenger, while the defendant was sitting in the driver's seat. This was sufficient to establish the defendant's knowledge of the weapon. See *Commonwealth* v. *Albano*, 373 Mass. 132, 135 (1977) ("Knowledge may be inferred when the prohibited item is found in open view in an area over which the defendant has control"). Additionally, based on Sergeant Deveney's testimony, one could infer that the gun was being passed around the interior of the vehicle. "Although not overwhelming, taken in the light most favorable to the Commonwealth, this evidence provided a sufficient basis for a juror to infer that the defendant knew about and had the ability to exercise dominion and control over [the firearm] . . . ." *Commonwealth* v. *Frongillo*, 66 Mass. App. Ct. 677, 681-682 (2006).

However, proof of the defendant's *intent* to exercise dominion and control is nonexistent, except for the inference that the majority now considers to be dispositive. Upon review of the record, I have not identified sufficient "plus factors" of other incriminating evidence that would warrant the inference that the defendant intended to exercise control over the firearm. See *Commonwealth* v. *Brown*, 34 Mass. App. Ct. 222, 226 (1993). First, although Sergeant Deveney observed both brothers handling and physically possessing the gun, he never observed the defendant touching the firearm. Furthermore, the defendant was parked in front of the Alvarez house, which supports the infer-

ence that the firearm was brought from there into the vehicle and would be returned to there. Most importantly, there was no evidence suggesting the presence of any past, present, or future collateral criminal activity that typically accompanies the possession of a firearm. See *Albano, supra* at 135-136. This is especially true here because no ammunition was found in the weapon, on anyone's person, or in the automobile. The Commonwealth does not contradict any of this evidence nor offer an alternative theory of events.

The majority states that "[i]n addition to the defendant's presence in the car and his knowledge of the gun, there was other incriminating evidence, i.e., 'plus factors,' to warrant the inference that the defendant intended to exercise control over the firearm." See *ante* at 795-796. The majority elaborates on what it has determined to be four "plus factors," which include, most significantly, the fact that the defendant was the owner and operator of the automobile. The majority also cites the defendant's proximity to the weapon, the defendant's behavior of slouching, and the time of night and the dimly lit street.

*Owner or operator of the vehicle.* The majority proposes that "[i]f the owner and operator of the car chooses not to exclude a passenger who he knows has a weapon, it is a reasonable inference that the owner and operator also has the intent to exercise dominion and control over the firearm as he does over the car itself."[3] *Ante* at 796. But why would the fact of the defendant's proprietary interest in the automobile indicate, in any way, that he intended to possess the weapon actually possessed by another? The inference is appropriate when a defendant is alone in his automobile or premises, or where there is additional incriminating evidence independent of his proprietary interest. The cases cited by the majority almost universally require incriminatory evidence in addition to, and independent of, the concept of an owner/operator's proprietary interest. This additional evidence, or "plus factors," usually are associated with evidence of the owner/operator's knowledge of, or participation in, collateral criminal activity.

---

[3]The majority must be aware, however, that firearm possession is not inherently nor necessarily a crime and that the right to legally possess a firearm repudiates any notion that possessing a weapon is inherently wrong.

The majority seems to be proposing a new rule of strict liability for owner/operators of automobiles and premises regardless of what their actual intent to possess a weapon or contraband might be. In all other circumstances, the reasonableness of an inference of intent to possess, when proving constructive possession, must ultimately be reasonable under the circumstances. The majority's new rule dispenses with any concern for the defendant's intent, the reasonableness of the inference, and ultimately any concern that the jury based its verdict on "conjecture" or "surmise." See *Commonwealth* v. *O'Brien*, 305 Mass. 393, 401 (1940). The majority tells us that the jury is not bound by this permissible inference, but as a practical matter, how could the jury find otherwise? The majority holding, by dispensing with the need to prove intent to possess the firearm and, simultaneously, dispensing with the requirement that an inference be reasonable, has established a legal principle that elevates form over substance where defendants are charged with constructive possession because they have a proprietary interest in the automobile or property where the weapon is discovered. Courts may now punish an owner or operator of an automobile, or a property owner, for simply tolerating the presence of a weapon or contraband within the limits of their proprietary interest.

This is particularly so in this case where, other than the defendant's knowledge of the presence of the weapon, there is no evidence of an intent to control. We know how the weapon arrived in the automobile and who was in possession of it. There was no evidence in the record that suggests that the defendant or any of the occupants had participated, or were about to participate, individually or jointly, in any criminal activity involving the gun. The gun was not loaded; no ammunition was in the automobile nor on anyone's person. There is no explanation, through evidence or theory, as to why the defendant here would intend to possess the weapon. The Commonwealth does not dispute any of the attendant circumstances as offered by the defendant regarding how the weapon arrived in the parked automobile, why the car was parked where it was, and why it was there at that time of night. While the jury were clearly not bound to believe the defendant's version of events, there was no other version of the facts proposed by the Commonwealth.

Without evidence, or a theory to the contrary, the jury would have to rely on surmise or conjecture to believe anything different. The jury could only believe, as the Commonwealth argued, and the majority endorses, that knowledge of a weapon by an owner or operator allows, if not requires, an inference that he intended to control the weapon. This inference, of course, is regardless of the attendant circumstances or of any evidence regarding his actual intention to possess the firearm.[4]

The majority lists additional plus factors but these are either not plus factors or not incriminatory under the circumstances of this case.

*Proximity of the weapon.* The defendant's proximity to the weapon is not a "plus factor" to support a reasonable inference of his intent to possess the weapon. The majority cites to two cases for this principle, neither of which support this view. In *Commonwealth* v. *Sadberry*, 44 Mass. App. Ct. 934 (1998), the court allowed the inference of the defendant's knowledge of the firearm under the automobile's front seat because the defendant, or one of his companions, had just fired the weapon in a school-yard (while the defendant was at least present), the smell of burnt gunpowder was still evident in the automobile, and if the defendant did not place the weapon under the front seat, he was aware that his companion had. *Id.* at 935. The defendant's ability to control the weapon was reasonably inferred from knowledge of and his proximity to it. *Id.* at 936. The *Sadberry* court however, unlike the majority here, did not then conflate knowledge and ability into proof of intent. *Ibid.* Rather, the court

---

[4]Considering a similar holding in the United States Court of Appeals for the Tenth Circuit, it was observed that "[t]o avoid injustice, it is necessary to impose an intent requirement. It is not unreasonable to conclude that a person sitting in a car knows if a gun is literally under his foot, and in such circumstances, the person clearly has access to the gun. But knowledge and access should not be enough to convict. Certainly the person has never taken actual possession, and if he lacks any intention to take possession of the item, then [G. L. c. 269, § 10(*a*),] is in no way implicated. On the other hand, if the person is mentally planning to use the gun at some point, then it seems reasonable to say that the person is possessing the gun. The question, of course, may be difficult to answer. But that difficulty does not mean that the court should take the burden away and let the prosecution infer intent from the mere fact of proximity. To the contrary, in the absence of evidence to show the defendant intended to exercise dominion and control, the government should not be allowed to prevail." McMurray, 85 Denv. U. L. Rev. at 560-561.

pointed to additional "plus factors" to show that "[w]hile his intent to do so is not easily susceptible of proof and is a close question, we again conclude that the evidence suffices to support a reasonable inference of his intent to do so, namely his prior activity before the stop and the presence in the car of the ski masks, gloves, black clothing, and two loaded guns, one of which was in plain view." *Ibid.* Here the court recognized the necessity of specific evidence of intent in addition to, and separate from, evidence of knowledge and ability to control. The additional evidence here was of the collateral criminal activity involving the weapon immediately before the automobile stop. The defendant was also the operator of the automobile, and the court did not rely exclusively on the basis of proprietary interest in it.

Similarly, in *Commonwealth* v. *Aiello*, 49 Mass. App. Ct. 496 (2000), the defendant was operating a motor vehicle that, upon being stopped, was found to contain a controlled substance in the front passenger seat as well as in the back seat area. In addition, the automobile emitted "a strong odor of marijuana." *Id.* at 497. While the court claimed to be more willing to infer control of the drugs to the driver rather than to a passenger based on knowledge alone, "some additional evidence beyond that of showing mere knowledge" and apparent proximity "was necessary here to warrant a reasonable inference of possession by the defendant." *Id.* at 498. Proximity is not a plus factor with regard to intent to possess but is only evidence of a defendant's ability to control the weapon, which is a necessary element of the crime.

*Behavior of passengers.* The majority next proposes that the occupants' slouching posture allowed the jury to infer that they "were engaged in a surreptitious criminal activity that they endeavored to conceal from view." Here, again, the majority conflates knowledge and ability with intent.[5] The Commonwealth argued in *Aiello*, as the majority does here, "that there is such additional evidence by reason of 'the defendant's suspicious conduct, including looking back at the officers at least six times with half of his body sticking out of the window while the

---

[5]Never mind apparently indicting an entire generation of young urban males based upon a commonly shared and otherwise innocent behavior.

officers were checking for warrants.' " The court held, however, that suspicious behavior "does not provide the kind of additional evidence which is required to support a finding that the defendant was able to exercise control over the drugs. Moreover, there was no evidence that would warrant an inference of the required intent to exercise such control." *Id.* at 498-499. See *Commonwealth* v. *Prentice P.*, 57 Mass. App. Ct. 766, 769 (2003) ("a defendant may not be convicted solely on the basis of consciousness of guilt evidence even when that evidence is coupled with presence"). The defendant's posture is indicative of nothing other than knowledge. His behavior is understandable, considering the circumstances, and is certainly not indicative of an intent to possess the firearm. The suspicious behavior here, at most, indicates the defendant's knowledge of the firearm and, again, is not a factor indicating an intent to possess the firearm.

*Location of incident and time.* Lastly, the majority claims that "the defendant *chose* to park his car on the much darker Chestnut Street instead of the well-lit Moody Street with which it intersected" (emphasis supplied). *Ante* at 797. Nowhere in the record is there evidence, or even a credible allegation, that the defendant *chose* to park on the darker of the two streets. The evidence does show, however, that the defendant chose to park his automobile immediately in front of his girlfriend's house, and had parked in almost the exact location three times that same day. The majority misreads *Commonwealth* v. *Albano*, 373 Mass. 132 (1977). There, the court held that a long list of unusual circumstances, including the time of night (i.e., 4:30 A.M.) of the incident, and the fact that the car's registration plates were deliberately obstructed and the weapon was protruding out from under the defendant's seat, was sufficient to infer that the defendant had knowledge of the presence of the firearm. *Id.* at 135. The decision had nothing to do with an inference of intent to possess the firearm, and the long list of attendant circumstances allowed an inference of the defendant's knowledge, not his intent to possess the firearm.

In summary, the majority has transformed evidence of "knowledge" and "ability" into elements sufficient to prove constructive possession. The legal fiction that is constructive possession is now supplemented with an additional legal fiction claiming

that a proprietary interest is conclusive proof of an intent to possess everything within the limits of the proprietary interest. The holding, therefore, dispenses with the historical requirement of proving "intent to possess" and will criminalize the behavior of an individual who never intended to touch, never mind possess, the firearm or contraband in question. The holding redefines "possession" in such a way that individuals who are trying to live within the limits of the law discover that they are in possession of a firearm, or other contraband, simply by becoming aware of it and having access to it.[6,7] A temperate application of the concept of constructive possession is still an appropriate legal principle. When, for example, the proprietary interest is exclusive, i.e., the defendant is the only person having access to the weapon or contraband, his exclusive control does infer, appropriately, an intent to possess. When a defendant is not alone or does not have an exclusive proprietary interest in the area, i.e., other individuals have either access to, or actual possession of, the weapon or contraband, additional evidence of his intent to possess the items should be required. The defendant owned the automobile, but not the two brothers who were holding the firearm while in a parking space directly in front of their house, which the defendant had visited for the purpose of a social date with their sister. There is no evidence here that the defendant intended to possess the weapon. The evidence and common sense lead us to exactly the opposite conclusion.

Finally, regarding the legal concept of "equal and inconsistent," a few observations are in order. The Supreme Judicial Court recently affirmed and clarified the application of the concept, stating that "evidence tending equally to support one proposition over the other applies only if the circumstances

---

[6]This is not the first time that criminal liability for possession has been framed this way in the Commonwealth. The Legislature determined that an individual was in constructive possession of narcotics by being in the company of a person possessing narcotics and having knowledge that the person possessed the drugs (see G. L. c. 94, § 213, as added by St. 1960, c. 660, § 1). The statute, however, was repealed in 1971. St. 1971, c. 1071, § 2.

[7]See Oliver Wendell Holmes, Jr., The Path of the Law, Harv. L. Rev. 457, 459 (1897) (the law must be framed in such a way as to enable even a "bad" man to "predict" the "material consequences" of his conduct; a man must know whether his conduct is within the law, or not).

'require []a leap of conjecture with respect to the essential elements of the crime charged.' " *Commonwealth* v. *Merry*, 453 Mass. 653, 663 (2009), quoting from *Commonwealth* v. *Chongarlides*, 62 Mass. App. Ct. 709, 712 (2004). I agree with the majority that appellate courts should not reweigh the evidence considered by a jury at trial. "It is not for [an appellate] court to consider any question of the weight of the evidence, but the only question before us is whether the jury could properly find the defendant guilty." *Commonwealth* v. *O'Brien*, 305 Mass. 393, 401 (1940). The question here is not the weight of the evidence but its sufficiency, because "if, upon all the evidence, the question of the guilt of the defendant is left to conjecture or surmise and has no solid foundation in established facts, a verdict of guilty cannot stand." *Ibid.* An appellate court should always have in mind a review of the sufficiency of the evidence because "it is not enough for the appellate court to find that there was some record evidence, however slight, to support each essential element of the offense; it must find that there was enough evidence that could have satisfied a rational trier of fact of each such element beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979). The concept merely reinforces our requirement that each element of a crime must be proven beyond a reasonable doubt. If the evidence tends equally to prove an inconsistent alternative, it is necessary to determine whether the jury relied on "conjecture" or "surmise" or was in fact able to reach a verdict based upon proof beyond a reasonable doubt.

The concept of "equal and inconsistent" is not an "anachronistic canard" when correctly understood and appropriately applied.